## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FLORENCE GAFFNEY,           :
                            :
        Plaintiff,          :
                            :
    v.                    :     3:14-cv-643
                            :     (JUDGE MARIANI)
UNITED STATES OF AMERICA, et al.,  :
                            :
        Defendants.     :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On the afternoon of June 30, 2011, Plaintiff Florence Gaffney was in the lobby of the Social Security Administration office in Scranton, Pennsylvania, when Administrative Law Judge Sridhar Boini allegedly walked up behind her in an intoxicated state, reached under her right arm, and grabbed her breasts. As a result of the incident, Plaintiff filed suit alleging that Boini, the United States, Knight Protective Services, Inc., Steamtown Mall Associates, L.P., and Prizm Asset Management Company all negligently caused her injuries. (Doc. 1). Presently before the Court is the United States' Motion for Summary Judgment.[1] (Doc. 83). For the reasons that follow, this Court will deny the United States' Motion.

---

[1] Steamtown Mall Associates and Prizm Asset Management Company jointly filed a separate Motion for Summary Judgement, (Doc. 81), which the Court addresses in a separate Opinion. Boini, who has proceeded pro se, has not moved for summary judgment. Knight Protective Services filed for bankruptcy before the initiation of this lawsuit and was never served with the Complaint.

## II. STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, the United States submitted a Statement of Material Facts in support of its Motion for Summary Judgment, (Doc. 88), and Plaintiff submitted a response, (Doc. 97). Thus, the following facts are undisputed, except as specifically noted:

In 2008, Sridhar Boini became an Administrative Law Judge ("ALJ") with the Social Security Administration. (Dep. of Sridhar Boini, Doc. 98-10 at 23-24). He was initially assigned exclusively to an office in Wilkes-Barre, Pennsylvania, but at some point he also began to work one to two days a week at the Social Security office in Scranton. (*Id.* at 23-24, 69). Around the same time he became an ALJ, Boini also began to turn to alcohol to relieve his stress. (*Id.* at 17-18, 35-37). While Boini maintains that this was not problematic at first, his drinking steadily increased over the next few years and culminated in a diagnosis of alcohol dependency in 2012. (*Id.* at 35-38, 50-53).

Prior to 2010, Boini would sometimes go out to lunch with coworkers and have one to two drinks before returning to the office. (*Id.* at 44, 46-47). According to Boini, these lunches would occur once a week at most, but were generally less frequent. (*Id.* at 44, 46). Then, in January of 2010, Boini went out to lunch with a couple of coworkers in Wilkes-Barre and had several drinks. (*Id.* at 38-39). After lunch was over, Boini took a walk by himself and, after his coworkers left, returned to the restaurant and had a few more drinks.

(*Id.* at 39). When he returned to the office he did not have his key card and began to bang loudly on the employee door until it was opened by someone. (*Id.* at 41).

The office's Chief ALJ at the time was Edward Brady. (Dep. of Edward Brady, Doc. 98-12 at 6-7, 18). Although Brady was not at work when the incident occurred, he received a call from a supervisor who was concerned that Boini had been drinking. (*Id.* at 19). A few days later, Brady talked to Boini and advised him that, as an ALJ, Boini needed to be very careful about how he acted in the office. (*Id.* at 20). According to Boini, Brady also stated, "if you're going to do that, just sign out and take leave for the rest of the day. Don't come back to the office." (Dep. of Sridhar Boini, Doc. 98-10 at 44).

After this time, Boini began to try and avoid consuming alcohol in Wilkes-Barre in an effort to conceal his drinking from management. (*Id.* at 59-60). Nevertheless, starting in 2011, the frequency at which Boini would consume alcohol during the workday increased. (*Id.* at 50). He would use the days he worked in Scranton "to consume alcohol during a workday and slip under the radar." (*Id.* at 89). When in Wilkes-Barre, Boini would still occasionally go out to lunch with coworkers and have a drink, but also would go to lunch by himself. (*Id.* at 60-61).

On June 30, 2011, Plaintiff, Florence Gaffney, went to the Scranton Social Security office to fill out a form. (Dep. of Florence Gaffney, Doc. 98-1 at 8, 12). While completing the form, she noticed someone who smelled strongly of alcohol come up behind her. (*Id.* at 12). The person then reached over and grabbed her breasts. (*Id.* at 13, 15-16). She

3

turned around, saw a man standing there, and said "Who are you to do that to me?" (*Id.* at 13). The man responded "I'm the Judge." (*Id.*). Plaintiff immediately went to the security guard stationed in the lobby of the Social Security office and reported the incident. (Dep. of Michael Nesko, Doc. 98-2 at 38-39). She pointed to the man who had grabbed her and asked the guard, Michael Nesko, to identify him. (*Id.* at 39-40). Nesko identified the man as Boini. (*Id.* at 39).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is

4

genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

Through this litigation, Plaintiff seeks to hold the United States, among others, liable

for the injuries she sustained as a result of Boini allegedly assaulting her in the Social

Security office. As a general rule, however, "[t]he United States, as sovereign, is immune

from suit save as it consents to be sued." *See United States v. Sherwood*, 312 U.S. 584,

586, 61 S. Ct. 767, 85 L. Ed. 1058 (1941). Nevertheless, through the Federal Tort Claims

Act ("FTCA"), Congress "waived the sovereign immunity of the United States for certain

torts committed by federal employees." *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S. Ct. 996,

127 L. Ed. 2d 308 (1994). Specifically, the FTCA waives immunity for, and thus allows the

district courts to hear,

> civil actions on claims against the United States, for money damages . . . for
> . . . personal injury . . . caused by the negligent or wrongful act or omission of
> any employee of the Government while acting within the scope of his office or
> employment, under circumstances where the United States, if a private
> person, would be liable to the claimant in accordance with the law of the place
> where the act or omission occurred.

28 U.S.C. § 1346(b)(1). "As the quoted language makes clear, the FTCA does not itself

create a substantive cause of action against the United States; rather, it provides a

mechanism for bringing a state law tort action against the federal government in federal

court." *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 264 F.3d 344, 362 (3d Cir. 2001).

Generally, the FTCA does not waive sovereign immunity for intentional torts, such as

assault and battery. *See* 28 U.S.C. § 2680(h). Thus, Plaintiff is barred from directly holding

the United States liable for Boini's actions.[2] Nonetheless, in *Sheridan v. United States*, 487

U.S. 392, 108 S. Ct. 2449, 101 L. Ed. 2d 352 (1988), the Supreme Court held that, though it

is generally true that the Government is not liable for its employee's intentional torts, if other

Government employees negligently "allowed a foreseeable assault and battery to occur,"

even when the assailant is a coworker, then those other employees' negligent failure to

protect "may furnish a basis for Government liability that is entirely independent of [the

assailant's] employment status." *Sheridan*, 487 U.S. at 401 (allowing an FTCA claim to

proceed when Naval Hospital employees allegedly failed to protect the public from assault

by an off-duty serviceman known to be intoxicated and armed with a rifle).

The Third Circuit has had occasion to explicitly address *Sheridan* situations at least

twice in the intervening years. First, in *Matsko v. United States*, 372 F.3d 556 (3d Cir.

2004), the Circuit allowed an FTCA claim to proceed under allegations that employees of

---

[2] This is true regardless of whether Boini was acting outside or within the scope of his employment at the time the assault occurred. If Boini was acting outside of the scope of his employment, this Court would lack jurisdiction to hear a claim against the United States *based solely on Boini's actions. See* 28 U.S.C. § 1346(b)(1) (granting district courts jurisdiction over "civil actions on claims against the United States, for money damages . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government *while acting within the scope of his office or employment.*") (emphasis added); *see also Matsko v. United States*, 372 F.3d 556, 558-60 (3d Cir. 2004) (dismissing, for lack of jurisdiction, a claim against the United States for an employee's assault when the assault occurred outside the scope of the assailant's employment, while permitting a failure to protect claim to proceed). On the other hand, if Boini was acting within the scope of his employment, his assault would fall within an exception to the FTCA's grant of jurisdiction and prevent this Court from hearing the claim against the United States. *See* 28 U.S.C. § 2680(h) (stating that, subject to certain exceptions, the FTCA's grant of jurisdiction does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."); *see also Doughty v. U.S. Postal Serv.*, 359 F. Supp. 2d 361, 367 (D.N.J. 2005) ("Even if the Court were to find that Defendant . . . was acting within the scope of his employment at the time he allegedly sexually assaulted Plaintiff, any claims against the Government arising therefrom would be prohibited under the FTCA." (citing 28 U.S.C. § 2608(h))).

the Mine Safety and Health Administration ("MSHA") failed to protect a business invitee from assault by MHSA coworker Rudy Kotor. *See Matsko*, 372 F.3d at 557, 561-62. Kotor "slammed [the plaintiff's] face into a briefcase" after the plaintiff unwittingly sat in Kotor's desk chair. *Id.* at 557. The Circuit found that, if Kotor's coworkers could have foreseen this harm and therefore should have acted to protect the plaintiff, a claim against the United States could lie. *Id.* at 561-62. Because the Complaint alleged facts that an MHSA employee originally offered the plaintiff Kotor's chair to sit in and that, after the attack occurred, another MHSA employee told the plaintiff "I told you don't piss Rudy [Kotor] off," while a supervisor smirked, the Circuit found sufficient allegations to indicate that the United States breached its duty to protect and that dismissal for lack of subject matter jurisdiction was inappropriate. *Id.* at 557-58, 561-62.

Conversely, in a later case, the Third Circuit found the *Sheridan* exception inapplicable when a high school student—who had been recruited into the Army and who, against direct orders and Army regulations, temporarily lived with his recruiter—stole a handgun from the recruiter's bedroom and robbed and shot a third party. *CNA v. United States*, 535 F.3d 132, 137-38 (3d Cir. 2008). Though the Circuit recognized *Sheridan*'s validity, it held that the plaintiffs-subrogees' claims "do not fall under [its] holding." *Id.* at 148. The Circuit rejected the argument that a duty to protect existed under the facts of this case because,

> [t]o begin, the harm here was not foreseeable. To repeat, the corpsmen in *Sheridan* knew danger lurked if they allowed a drunk serviceman with a

8

loaded rifle to leave hospital grounds. But in our case Lewis [i.e., the recruiter] knew of no obvious danger in taking in a recruit [i.e., the assailant] who had passed background checks. And Lewis's supervisor (Albrecht) likewise knew of no obvious danger that Lewis would defy his order that Lewis not take Armstrong into Lewis's home.

*Id.* at 148-49. Therefore, the Circuit held that neither Lewis nor Albrecht had a duty to protect the public from this particular type of harm.

As the above discussion makes clear, Plaintiff may be able to hold the United States liable if (1) its employees negligently allowed a foreseeable assault to occur and (2) such negligence is actionable under Pennsylvania law. In Pennsylvania, "[t]o establish a cause of action in negligence, the plaintiff must demonstrate that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage." *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998). The United States argues that, under the circumstances of this case and the law of Pennsylvania, Boini's actions in relation to Plaintiff were not foreseeable. (Doc. 87 at 7-22). Thus, the United States argues, its employees had no duty to protect Plaintiff from Boini and, consequently, could not have been negligent. (*Id.*).

"The existence of a duty owed by a defendant is the threshold question in a negligence action, and this is generally a question of law." *Perez v. Great Wolf Lodge of the Poconos LLC*, 200 F. Supp. 3d 471, 478 (M.D. Pa. 2016) (quotation marks omitted). "Generally, there is no duty to control the acts of a third party unless the Defendant stands in some special relationship with either the person whose conduct needs to be controlled or

9

with the intended victim of the conduct, which gives the intended victim a right to protection."

*Reason v. Kathryn's Korner Thrift Shop*, 169 A.3d 96, 102 (Pa. Super. Ct. 2017) (quotation

marks and alteration omitted); *see also Midgette v. Wal-Mart Stores, Inc.*, 317 F. Supp. 2d

550, 557-58 (E.D. Pa. 2004) ("As a general rule under Pennsylvania law, absent a pre-

existing duty, a party cannot be held liable for the criminal actions of a third party unless that

party assumed a duty, through some act of its own.").

Plaintiff argues that the United States owed her a duty under § 344 of the

Restatement (Second) of Torts. (Doc. 98 at 22-27). Section 344 of the Restatement

provides

> A possessor of land who holds it open to the public for entry for his business
> purposes is subject to liability to members of the public while they are upon
> the land for such a purpose, for physical harm caused by the accidental,
> negligent, or intentionally harmful acts of third persons[3] or animals, and by the
> failure of the possessor to exercise reasonable care to
>
> > (a) discover that such acts are being done or are likely to be done, or
> >
> > (b) give a warning adequate to enable the visitors to avoid the harm, or
> > otherwise to protect them against it.

RESTATEMENT (SECOND) OF TORTS § 344. Comment f to § 344 elaborates on a

landowner's duty to police his or her land:

> Since the possessor is not an insurer of the visitor's safety, he is ordinarily
> under no duty to exercise any care until he knows or has reason to know that
> the acts of the third person are occurring, or are about to occur. He may,

---

[3] Comment b to § 344 defines "third persons" to "include all persons other than the possessor of the land, or his servants acting within the scope of their employment. *It includes such servants when they are acting outside of the scope of their employment.*" RESTATEMENT (SECOND) OF TORTS § 344 cmt. b.

however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

RESTATEMENT (SECOND) OF TORTS § 344 cmt. f. Both § 344 and comment f have been

adopted as accurate statements of the law in Pennsylvania. See Moran v. Valley Forge

Drive-In Theater, Inc., 246 A.2d 875, 878 (Pa. 1968); Feld v. Merriam, 485 A.2d 742, 745

(Pa. 1984).

Section 344 does not impose a duty on landowners to prevent all criminal activity or

intentional torts that occur on their land. Instead, § 344 only imposes liability when a

landowner does not "take reasonable precaution against that which might be reasonably

anticipated." Feld, 485 A.2d at 745 (emphasis added). Thus, a court found that a property

owner was under a duty to provide reasonable precautions against an assault that occurred

in the owner's parking lot when the owner knew that numerous car thefts had previously

occurred on the property. Morgan v. Bucks Assocs., 428 F. Supp. 546, 550-51 (E.D. Pa.

1977). The court reasoned that the history of criminal activity in the parking lot was

sufficient for a jury to determine that the property owner knew or should have known that

there was a likelihood of third party conduct that could endanger visitors "and that

defendant's past experience was 'such that he should reasonably anticipate careless or

criminal conduct on the part of third persons.'" *Id.* at 551 (quoting RESTATEMENT (SECOND) OF TORTS § 344 cmt. f); *see also Murphy v. Penn Fruit Co.*, 418 A.2d 480, 483-84 (Pa. Super. Ct. 1980) (holding that a landowner was under a duty to provide reasonable precautions against a stabbing that occurred in the owner's parking lot when there has been a history of purse snatchings and muggings on the property).

Conversely, in *Midgette v. Wal-Mart Stores, Inc.*, a court held that Wal-Mart was not under a duty to take reasonable precautions to prevent an employee's husband from shooting the employee in the store because the plaintiff had "not shown how Defendant had either actual or constructive knowledge of the likelihood of [the husband]'s conduct" or any "evidence of frequent episodes of domestic violence occurring on the store premises by [the husband] or anyone else." 317 F. Supp. 2d at 562-63. The Court reasoned that "despite [the husband]'s numerous visits to the store," the plaintiff did not present any evidence that her husband "behaved in a dangerous, violent, or unbecoming manner on the Wal-Mart premises" and that, therefore, it could not "be expected that Wal-Mart would have reason to foresee [the husband]'s violent actions." *Id.* at 562.

The Court's analysis, therefore, must focus on what Boini's coworkers knew or should have known of either Boini's prior conduct or the prior conduct of third parties generally prior to June 30, 2011, and whether their knowledge was of such a nature as to render Boini's assault of Plaintiff reasonably foreseeable. Because Plaintiff has not pointed

to any conduct of third parties generally, the Court will focus its inquiry on what Boini's coworkers knew or should have known of Boini's conduct prior to the incident in question.

Therese Hardiman, an ALJ in the Wilkes-Barre office, testified that she occasionally had lunch with Boini and at almost all of these lunches Boini would consume martinis. (Dep. of Therese Hardiman, Doc. 98-11 at 10-11). She testified that he generally had "one, maybe two" drinks, but that on one occasion someone commented to her that Boini had consumed three drinks. (*Id.* at 13, 15). Michelle Wolfe, another ALJ who worked with Boini, testified that she remembered seeing Boini consume alcohol at lunch "probably at least once or twice maybe." (Dep. of Michelle Wolfe, Doc. 88-1 at 18-19, 28). Wolfe only remembered seeing Boini ever consume one drink while at lunch. (*Id.* at 19).

Edward Brady was also an ALJ in the Wilkes-Barre office and was the Chief ALJ from March or April of 2009 to August or September of 2010. (Dep. of Edward Brady, Doc. 98-12 at 6-7). Brady remembered seeing Boini having a drink at lunch on two occasions. (*Id.* at 12). According to Boini, Brady once commented at lunch that Boini "guzzled that [drink] pretty quickly," but Brady had no recollection of that remark. (Dep. of Sridhar Boini, Doc. 98-10 at 72; Dep. of Edward Brady, Doc. 98-12 at 16). In January of 2010, Brady received a phone call from an employee who was concerned that Boini had been drinking after he had banged loudly on the employee door. (Dep. of Edward Brady, Doc. 98-12 at 18-19, 23). Brady spoke to Boini about the incident a few days later and indicated that Boini should be careful how he acts in the office. (*Id.* at 20). Brady testified that he thought he

13

"alluded to the fact that there was a concern that maybe [Boini] had been drinking." (Id. at 21). Brady also testified that he might have said that "the office is not a place you should, in my estimation, be consuming alcohol and then returning back to." (Id. at 24). According to Boini, Brady told him that "if you're going to do that, just sign out and take leave for the rest of the day. Don't come back to the office." (Dep. of Sridhar Boini, Doc. 98-10 at 44). Brady did not remember seeing Boini have a drink at lunch after the January incident. (Dep. of Edward Brady, Doc. 98-12 at 44).

Knight Protective Services contracted with the Department of Homeland Security to provide security services for the Social Security office in Scranton. (Dep. of Michael Nesko, Doc. 98-2 at 7-10, 56). Michael Nesko was a security guard for Knight Protective Services and was stationed in the Social Security office. (Id. at 8, 10, 56). A woman, Jennifer Ezerkis, who worked in another office in the building told Nesko the following:

she said [Boini] went into her office and, like, she was over in the corner where the copier machine was and he went over to her and he was talking to her and he kind of went in the corner and he didn't touch her or anything, but he just kept like pushing his weight toward her in the corner and she like -- he wouldn't let her move.

(Id. at 32-34). The encounter made Ezerkis feel uncomfortable, and Nesko reported it to a manager in the Scranton Social Security office, Michelle Wren. (Id. at 25, 32, 37). At some other point, Nesko also told Wren that Boini, on a few occasions, had come back from lunch with alcohol on his breath. (Id. at 23-25).

14

With respect to the sequence of events, Nesko testified that he first notified Wren that he smelled alcohol on Boini's breath and later reported the incident involving Boini making Ezerkis feel uncomfortable. (*Id.* at 44). Initially, Nesko testified that he made both of these reports prior to Boini's encounter with Plaintiff on June 30, 2011. (*Id.*). Later, Nesko testified that he noticed the alcohol on Boini's breath "[w]ithin weeks" of July of 2012. (*Id.* at 50). When asked to clarify whether the report of alcohol on Boini's breath occurred before or after June 30, 2011, Nesko testified that he was "not sure." (*Id.* at 57-58).

The United States argues that, based on the above, Boini's coworker could not have reasonably foreseen that Boini would subsequently sexually assault Plaintiff. The Government points to a number of cases to support its position. Most of the cases the United States relies on, however, do not analyze a defendant's duty under § 344 of the Restatement and are therefore largely irrelevant to the present case. *See generally Sabric v. Lockheed Martin*, 532 F. App'x 286 (3d Cir. 2013); *Robinson v. Family Dollar Inc.*, 679 F. App'x 126 (3d Cir. 2017); *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418 (Pa. 1968).

Under § 344, prior conduct does not need to be of the exact same nature to impose a duty on a landowner to take reasonable measures to control the conduct of third parties. *See, e.g., Morgan*, 428 F. Supp. at 550 (rejecting the argument that a defendant's "knowledge of the occurrence of numerous car thefts [on the property] did not impose upon it a duty to protect persons from criminal assaults"). It is enough that a landowner's prior knowledge renders the ultimately harmful conduct reasonably foreseeable. Thus, in

*Paliometros v. Loyola*, a court found a motel owner had a duty to exercise reasonable care to prevent a sexual assault from occurring when the owner "knew that he was renting rooms to a fraternity for the purpose of the fraternity's [sic] holding a party with invited guests" and knew that "there undoubtedly would be underage drinking going on." 932 A.2d 128, 130, 134 (Pa. Super. Ct. 2007).

Here, viewing the evidence in a light most favorable to Plaintiff, some of Boini's fellow ALJs knew that Boini imbibed alcohol during the workday and that, on at least one occasion, Boini returned to the office after drinking and acted in a manner that was inconsistent with his normal behavior by pounding loudly on a door. Further, Wren knew that Boini was coming back from lunch with alcohol on his breath and that his physical crowding of Ezerkis made her feel uncomfortable enough to report it to security officer Nesko. Problematic alcohol consumption such as this is not so attenuated from drunkenly engaging in unwanted sexual contact as to render the latter behavior wholly unpredictable based on the former. Further, Boini's actions in relation to Plaintiff were not unrelated to his alcohol consumption as Plaintiff testified that Boini smelled strongly of alcohol at the time of the assault. (Dep. of Florence Gaffney, Doc. 98-1 at 12-13). Given what Boini's colleagues knew about his alcohol consumption during the workday, it was reasonably foreseeable that Boini might become intoxicated and his judgment affected thereby, return to work, and act in a sexually inappropriate manner towards the Social Security Administration's business invitees. Consequently, the Court cannot say that, on the record before it, the United States

did not have a duty to exercise reasonable care with respect to Boini's actions towards Plaintiff.

## V. CONCLUSION

For the reasons outlined above, this Court will deny the United States' Motion for Summary Judgment.  A separate Order follows.


Robert D. Mariani
United States District Judge